METRO GOVERNMENT AT ALL. ARGUMENT IS NOT TO EXCEED 15 MINUTES FOR THE PLAINTIFF, AND 15 MINUTES TO BE SHARED BY THE DEFENDANTS. MR. MARQUIS, YOU MAY PROCEED FOR THE APPELLANT. I'D LIKE TO FOCUS MY ARGUMENT WHERE THE DISTRICT COURT LANDED IN THIS CASE, WHICH IS THE REASONABLE TIME, PLACE, AND MANNER ANALYSIS. THE DISTRICT COURT FOUND THAT THE RESTRICTION ON SPEECH WAS CONTENT-NEUTRAL AND THAT THE FORUM QUESTION WAS IRRELEVANT BECAUSE IT WAS GOING TO BE INTERMEDIATE SCRUTINY EITHER WAY. FOR PURPOSES OF THIS MORNING, LET'S GO THERE. I'M NOT WAVING OR ABANDONING ANY OF MY PRIOR ARGUMENTS. I STAND ON MY BRIEF ON THOSE. THE PERMIT ISSUED BY METRO IN THIS CASE TO CHURCHILL-DOWNS GRANTED UNBRIDLED DISCRETION TO TREAT THE PERMITTED AREA AS IF IT WAS THEIR OWN PRIVATE PROPERTY. THE TESTIMONY WAS UNANIMOUS ON THAT POINT. THEY CAN TREAT IT LIKE THEIR OWN PRIVATE PROPERTY. MAJOR JOHNSON AND CAPTAIN SMITH TESTIFIED THAT CHURCHILL-DOWNS COULD REMOVE SOMEONE FOR ANY REASON. OBVIOUSLY, ON PRIVATE PROPERTY, THERE AREN'T FIRST AMENDMENT PROTECTIONS AS AGAINST A PRIVATE INDIVIDUAL. THE ONLY PARENT LIMITATION THAT MR. SWEENEY, WHO IS METRO'S 30B6 WITNESS, ACKNOWLEDGED WAS, WELL, THEY STILL HAVE TO COMPLY WITH RELEVANT LAW. WELL, THEY HAVE TO DO THAT ANYWAY. THEY HAVE TO DO THAT IN THE RACETRACK. I MEAN, THE EXAMPLE THAT HE GAVE WAS THEY CAN'T GO AROUND BEATING SOMEBODY WITH A STICK. WELL, I CAN'T DO THAT IN MY HOUSE. THEY'LL PUT ME IN HANDCUFFS IN MY OWN LIVING ROOM IF I'M BEATING SOMEBODY WITH A STICK. THAT'S NOT A PERMIT ISSUE. THAT'S ABOVE AND BEYOND THE PERMIT. THAT'S A LAW OF THE LAND ISSUE. SO I AGREE WITH MR. SWEENEY WHEN HE SAYS IF THEY'RE DOING THAT, THAT'S GOT NOTHING TO DO WITH THE PERMIT. THAT'S A LAW ENFORCEMENT ISSUE. THE PROBLEM IS WHEN WE TALK ABOUT CONSTITUTIONAL ISSUES AND WE TALK ABOUT EXCLUDING SOMEONE FOR REASONS OTHER THAN THE TICKET REQUIREMENT OR SELECTIVELY ENFORCING THE TICKET REQUIREMENT, HE TOOK THE SAME POSITION. HE SAID, THAT'S FOR SOMEBODY ELSE TO DECIDE. AND HE TOLD ME IN THE DEPOSITION, THAT'S FOR SOMEBODY LIKE YOU TO LITIGATE. AND HE ACTUALLY SAID, IF REMOVING SOMEONE FOR A DISCRIMINATORY REASON WOULD VIOLATE THE LAW, BUT WOULD NOT NECESSARILY VIOLATE THE PERMIT, IN OTHER WORDS, THAT'S NOT A PERMIT ISSUE. WELL, IT IS A PERMIT ISSUE. BECAUSE WITHOUT A PERMIT, THERE IS NO TICKET REQUIREMENT. UNLIKE THE BEATING WITH A STICK LAW, THAT'S THE LAW OF THE LAND REGARDLESS OF A PERMIT. THIS IS CENTRAL AVENUE. THIS IS A PUBLIC STREET. WITHOUT A PERMIT, YOU CAN'T REQUIRE SOMEBODY TO SHOW A TICKET TO ACCESS CENTRAL AVENUE. IT'S BUT FOR THE PERMIT THAT THIS PURPORTED TICKET RESTRICTION EVEN EXISTS. SO I'M A LITTLE BIT CONFUSED AT THE MOMENT. IS YOUR COMPLAINT REALLY THAT OTHER PEOPLE WERE BEING ALLOWED IN THIS PERMITTED AREA AND THAT YOUR CLIENTS WERE ESSENTIALLY DISCRIMINATED AGAINST BECAUSE OF THE CONTENT OF THEIR MESSAGE? I THINK THAT WHEN YOU TALK ABOUT UNBRIDLED DISCRETION, THERE DOESN'T ACTUALLY HAVE TO BE CONTENT DISCRIMINATION. AS LONG AS IT ALLOWS FOR THE CASE OF AMERICAN JEWISH CONGRESS TALKS ABOUT IF YOU GIVE DISCRETION TO A GOVERNMENT OFFICIAL TO DECIDE WHO CAN AND CAN'T SPEAK. IN THIS CASE, IT'S WORSE BECAUSE IT'S NOT EVEN A GOVERNMENT OFFICIAL. IT'S A PRIVATE ENTITY. THEY GAVE THEM THE RIGHT TO DECIDE WHO CAN AND CAN'T SPEAK. AND THEY DID. THEY WERE ALLOWED TO TESTIFY. WE KNOW THAT ON FRIDAY, MR. ESTEFAN WAS ALLOWED TO TESTIFY IN THE SAME AREA, ON THE SAME BLOCK BETWEEN 3RD AND 4TH STREET. AND HE SAID THAT LOUISVILLE METRO POLICE, NOT EVEN KENTUCKY STATE POLICE, LOUISVILLE METRO POLICE WALKED RIGHT PAST HIM AND ALLOWED HIM TO STAY THERE. AND HE SAID HE WAS ACTUALLY CLOSER TO THE RACETRACK THAN MR. BLANKENSHIP WAS. MR. BALL, THE CHURCHILL DOWNS 30B6 WITNESS, TESTIFIED IF SOMEBODY'S HEADED TOWARDS WAGNER'S PHARMACY, WHICH IS WITHIN THE TICKETED AREA, HE SAID I'M NOT GOING TO ASK THEM FOR A TICKET. SO THERE IS EVIDENCE HERE THAT IT WAS APPLIED SELECTIVELY. BUT THE ARGUMENT IS THERE'S UNBRIDLED DISCRETION TO TREAT THIS LIKE THEIR OWN PRIVATE PROPERTY. AND SUPREME COURT CASE LAW IS CLEAR. WHEN YOU GIVE UNBRIDLED DISCRETION AND THERE'S NO GUIDANCE AS TO THERE'S ARBITRARY ENFORCEMENT THAT CANNOT BE A REASONABLE TIME, PLACE, AND MANNER RESTRICTION. COUNSEL, THERE WAS A LIMITED AREA SUBJECT TO THE PERMIT. AND IT WAS, AS I UNDERSTAND IT, AN ACCESS POINT THROUGH WHICH THE PUBLIC COULD MOVE INTO THE AREA WHERE THE EVENT WAS BEING HELD. THERE HAD TO BE SOME ENTRANCE AND EGRESS POINTS TO GET INTO THE PROPERTY. AND IT WAS SEEMED THAT THAT AREA OF ENTRYWAY WOULD HAVE TO BE CONDUCTED IN AN ORDERLY FASHION SUCH THAT THE PUBLIC COULD MOVE THROUGH TO ENTER THE PREMISES FOR THE EVENT. FOR PURPOSES OF SAFETY AND PUBLIC SAFETY AND PUBLIC ORDER, WHY WOULDN'T THAT BE AN ADEQUATE JUSTIFICATION FOR THE ISSUING OF THE PERMIT SO THAT THE ENTRY POINT AND THE AREA AROUND THAT COULD BE REGULATED AND CONTROLLED IF FOR NO OTHER REASON THAN REASONS OF PUBLIC SAFETY? Well, that's going to the reasonably, narrowly tailored to serve a significant government interest prongs of the reasonable time, place, and manner requirement. First of all, I'd like to point out, the permittee here is Churchill Downs. Josh Ball is, he's the one that filled out the application. The event plan was his. And he testified that according to the permit, the ticketed area that you're speaking of was between 4th Street and 9th Street on Central Avenue. Mr. Blankenship was not in that area. He was between, he was, and I asked him in his deposition, does that mean if someone is east of 3rd Street, they don't require a ticket? And he said, that's right. Mr. Blankenship was east of 3rd Street. So I don't know how, even the district court said the event plan was necessary, as you said, to control crowds and to protect government, to protect public security. But if the permittee himself doesn't believe that that area needs to be ticketed, then how is it serving a significant interest? And I think the second issue is, the ticketing requirement was never enforced. There's no evidence in the record that... Wasn't your client told he just had to move across the street or down the walkway or somewhere and he could continue to preach and that would have remedied the whole problem? He was told, well, I mean, there has to be a starting point somewhere. And he was told that he could not be in that area. And I cited case law that talks about, you can't say that your rights weren't violated because you could have exercised them across the street or somewhere, no matter how nearby it is. The point is, this is a... Well, you do have to show that your client was unreasonably restricted or was injured in some way or that his speech was impaired such that he couldn't, there were no reasonable alternative means of communication and he couldn't reach his targeted audience. And how are you showing that if all he had to do was move a bit across the street or down the walkway and continue to preach? Well, they make that argument in cases such as this. All you had to do was move over here. If you watch the video, they came up to him and they immediately, he was not given the opportunity to move. Now, they claim that, well, the Churchill Downs security came up before that to tell him, you can't be in this area. But these... Wasn't that true? I mean, at least there was an interaction on the video. There was. Between the security guards and Mr. Blankenship. Well, I think it was not captured on video, but I don't dispute, well, I guess it was captured on video. They were speaking with Mr. Estefan, who was part of the group, but they didn't communicate with Mr. Blankenship specifically. So, you mentioned earlier that Mr. Estefan was in the same place the previous day? He was on the same block, yes. And he was allowed to stay. Correct. And then this day, of the events in question, what was Mr. Estefan told, according to you? Well, he was with Mr. Blankenship and he was told, you've already been told you can't be here. Well, when he was told he couldn't be here, he was all the way up by the racetrack and he was told, there's a zone you can be in. You have to go preach in that zone. And he landed on this block between 3rd and 4th Street. And again, Metro Police let him be there. They didn't have any problem with him being there at that point. Was he in the same relative position? I mean, he was inside the fence or there wasn't a fence? He was on the same block. So he was inside the sign, which was actually on 3rd, which apparently was in the wrong place. As Josh Ball testified, it was supposed to be on 4th. So he was in the same block, but he was actually closer to the racetrack where he was standing on Thursday, or I'm sorry, on Friday, to where Mr. Blankenship was on Friday. Is there evidence that you can point to showing that other people who were not engaged in religious protests were allowed to be in that area? Well, I don't think that I have evidence that – first of all, we don't know who had checked for tickets. So, I mean, in the video, there's a man peddling T-shirts, there's a woman sitting with a sign. I don't know if they were told to leave or if they were allowed to be there, but nobody was ever checked for tickets. So I don't know how you decide who – How do you know that? Did you have observers there taking account of whether people were checked for tickets? Well, they were in an area where they were not yet checking tickets, right? Like, they were proceeding to where they would check tickets. Presumably, to get into the racetrack, you would have to show a ticket, correct? Right. But the reason they weren't checking tickets in this area is because they were Well, but they're claiming that you have to have a ticket to get into this area, and they rely heavily on Reform America. And that's a completely different case, because there the plaintiffs tried two different times to get in two different entry points to the – it was a restricted area. It wasn't inside the building, as I understand it. It was a restricted area. And they were stopped both times and stopped from getting into the restricted area. And they were asked, do you have a ticket? No. Then you can't come in. And this court found it important because it mentioned no one that was not properly credentialed ever got into the restricted area. So this area, you say it's not restricted. There was a sign earlier, right? So the area that they're in, let's say it's defined by the fence and a sign that says no trespassing, right? And then further on, you give your ticket and you go into the grounds. Well, the fencing, it's important to know, started long before the sign. So you can't really rely on the fence to define the ticketed area. There was a no trespassing sign. I'm saying something else. I'm not talking about – it may – he was not yet in a ticketed area, right? They told him he was in a ticketed area. Excuse me. He was in an area before you have to give your ticket. But he was also in an area after there was a sign up that said no trespassing and don't come in if you don't have a ticket, basically, right? He was inside the signed area, correct. And no one at that point was asked to see it to show a ticket. Right. But there's a sign that said, what is it, valid credentials only beyond this  Correct. And so he was in that, you want to call it a no man's land, between the sign and where you have to give your ticket. Correct. He was past the sign, but he wasn't yet at the racetrack. And was he asked by either the security officers or the state troopers, I guess they were. Was he asked, do you have a ticket? He was never asked by anyone, security guards or anyone, if he had a ticket. Mr. Estefan was never asked, either on Friday or Saturday. And everyone that I asked, I asked Mr. Ball in his deposition, were they checking for tickets? And he said, I don't know. Well, he would be the one to know. He's the head of security. So in looking at the video, it appeared that the other people in that area were proceeding in a stream of people towards something at the end of the fenced off area, which presumably was the ticket showing place. Am I correct at that? Most of the people, yes, were walking in one direction and it was towards the racetrack. Now, there were others, as I mentioned, walking the other way, a guy selling T-shirts and there were other people that were not. So did you make a big point in the proceedings below or in your briefing about the guy selling T-shirts? I did not. I didn't bring that up, no. Because wouldn't, I mean, if the guy selling T-shirts was selling Churchill Down T-shirts or T-shirts showing a picture of a horse or something like that and he was allowed to stay, you might have a content-based argument, but you didn't make that argument, correct? I didn't bring up the man with the T-shirts, but again, the point is no one was in this area, Mr. Blankenship or otherwise, there's no testimony that anyone ever had to show a ticket to get into this purported ticketed area. Any further questions? Because his red light is on. Everybody's getting to their red light today. Thank you. Thank you. Counsel and your honors, may it please the court, my name is Bruce Paul. I'm here on behalf of Louisville Metro and I am splitting with Officer Young's counsel. I'm taking eight minutes and Officer Young's counsel is taking seven minutes. A couple of points on the record before I get into what I have to talk about. First, in the video, which is record 62, and it's at minute point 1311 and 30 seconds, Estefany says, yesterday I had state troopers threaten me with trespass. We don't have any records of what happened the day before with Mr. Estefany, but we do have Mr. Estefany saying on the record that he was threatened the day before with trespass for being in the same area. That goes to the point of the counsel's talking about, well, Metro police walked by Mr. Estefany. Again, I don't know where in the record that exists, but Metro Louisville was not on the scene arresting folks. KSP was the arrestees. In the reply brief, this goes to the point of in the reply brief, it's argued that this is an as-applied challenge to this permit. Well, as applied to Mr. Blankenship, Metro Louisville did not arrest or tell him to leave or do any of that sort of stuff. That would have been Churchill Downs staff, and that would have been Officer Young. It's also in the record. I'm losing you. You're representing Metro Louisville, Jefferson County. The permit issuer. The permit issuer. The arrest was by the state troopers, is that right? Correct, Your Honor. Louisville Metro was not involved in anything except the permit. Metro Louisville. I don't want to represent to the court that Metro Louisville wasn't involved with anything because they were managing traffic on the greater Central Avenue area. There were Metro officers in the vicinity for vehicular traffic purposes, but in the space where we're talking about, Metro Louisville was not involved. That's correct, Your Honor. Your point is that if Metro were liable, it could only be for issuing the permit that allowed Churchill Downs to limit who would be in this corridor area. That's the only way we can understand this lawsuit against Metro Louisville, Your Honor. Your colleague representing Elliot Young, he's an employee of what? Kentucky State Police. That's where we would get the Kentucky State Police part. Correct, Judge. The other point of the record that I want to mention is that there is, it's not on video, but there is record that Judge Jennings cited to in her summary judgment order where Blankenship was warned that he could not be there without the ticket. That's at record 71-1. It's page number 1009. It's the deposition testimony of a Captain Jeremy Smith, and his deposition pinpoint is page 9, lines 11 through 20. So there is evidence in the record that supports that Mr. Blankenship was warned. Again, not our issue necessarily, but I just want to put the record out there. So what role do you think Metro has in the question of whether there could have been content discrimination here because of the T-shirt seller person being allowed to be in this corridor? We are not familiar with that in the record. We can run with a hypothetical if that is. Hypothetically, in viewing the video, hypothetically, a viewer saw a T-shirt selling or a person sitting on the ground with T-shirts in front of him. We would ask two questions. From the permit issuer standpoint, we would ask two questions. One, was the person within, inside, which is to say west of the third street. Hypothetically, the person is right near Blankenship. Okay. Then the second question is, did that person have valid credentials? There are, of course, vendors that are permitted to have the signage. Remember, the no trespassing signage did not actually reference tickets. It referenced credentials. There are all sorts of folks that could go through there. There could be tickets. There could be credentials. There could be any number of things. This actually isn't that different from the Reform America v. Detroit case, where I don't want to suggest that the record was misrepresented by counsel, but the police officers there didn't really say anything different than what was said here. It was not, I need to take your ticket, to the person trying to enter the restricted area. It was, do you have tickets? You can't be here without a ticket. Well, there's no question that Mr. Blankenship didn't have a ticket. In the same way, there was no question that the protesters in the Reform America case didn't have tickets. The mere asking of tickets, the mere suggestion that you can't just stand here and do anything. The record also shows that there were dancers. So the record shows there were dancers here in this area. That were told to leave. Oh, the dancers were told to leave? Yes, they were told to leave. And I can give you, that's record 55-7. That's deposition testimony of a Johnson. And that's page ID 50, I'm sorry, 544, and then 555 through 556. And his pinpoint citation of that deposition testimony is page 39, lines 24. Excuse me, through page 40, lines 2. So yes, dancers were there. Dancers were asked to move. Utterly unfamiliar with any vendors. It's possible that there could be vendors who had credentials. But if they were uncredentialed under the permit, the idea of ensuring a good flow of traffic, as Judge Clay was referencing, safety to the 160,000 folks of all ages, races, and abilities who are coming and going from this event. The point of that area was before they got into the gates, they needed to thin the crowd to make sure that the people in that area were simply going to the event. Well, hypothetically, how would allowing a hypothetically credentialed T-shirt purveyor to sit on the ground in that area impact the First Amendment analysis of Blankenship? Well, under the Saeed case, that certainly was a factor in Saeed versus City of Dearborn. There the court held, of course, as this court knows, it's this court's case, that there wasn't a restricted area. A, everyone was allowed to pass through that area. And B, vendors whose storefronts there were allowed to market it. And so there the question was not whether it was narrowly tailored. There the question was, was there a substantial interest? There couldn't have possibly have been a really substantial interest at limiting traffic in that case on that particular sidewalk because they hadn't really restricted anyone from walking there or selling things at all. In this case, and so to your point, Judge Moore, in this case, if there were vendors allowed to set up in the same space that Mr. Blankenship was preaching, that might pose the same problem that presented the court in Saeed. But that's not what the record shows here. Dancers were asked to leave. Mr. Blankenship was asked to leave. We're not familiar with any other examples of anyone. This reference to the vendor is news to me. But I think that the record is very different. I see that my time is up. Thank you. May it please the court and counsel. I'm Brent Combs. I represent Kentucky State Trooper Elliot Young. And I'm speaking from an entirely different perspective than our co-defendant. This is a unique case, as the court has already pointed out. I think you've probably already hit on several points that I would make. But it's unique in that normally when we have a case where a police officer has been sued and a government entity has been sued, it's usually the entity that the officer works for. In this case, it's not. Trooper Young has no association with Louisville, Jefferson Metro. So speaking strictly from his point of view, he was not even present for most of the facts that lead up to the arrest. He doesn't know much about the policy, the permit that was issued. All he knows, as appellant's counsel said, the testimony was unanimous among all the witnesses that the permit allowed Churchill Downs during the Kentucky Derby to treat this property as if it was private property. As far as Trooper Young knows, when he arrests somebody for criminal trespass here, it's no different than if somebody was standing in your front yard preaching to people on the street and you called the police to have the trespasser removed. So for Trooper Young, this case doesn't really turn on any subtle legal arguments, which is a good thing because both counsel here with me are, I'm sure, far greater experts on First Amendment law than me. I think this may be the first First Amendment case I've ever had. So one thing in looking at the video is there was this conflict between your client, Young, and Blankenship as to whether Blankenship had been advised that he needed to leave before he was arrested. What is your client's position? I'm not sure there's so much of a conflict, Your Honor. I believe if we look at the deposition from Trooper Young, he had been told, I think it was within an hour, prior to the point where he arrested Mr. Blankenship, and we saw this in the video as the court has pointed out, that the Churchill Downs security had already come to these guys and talked to Mr. Estefan and said, you know, hey, you don't have a ticket, you have to leave, and that's at the point in the video, I think it was about 1310, when he came back and talked to Mr. Blankenship, and Mr. Blankenship told him, hey, ignore those guys, don't even entertain them, they're not cops. So at that point, these people went to the state police and said, here, we've told this guy to leave, and he hasn't left. He's already been told by a representative of the property owner, as far as Trooper Young is concerned, that he has to leave. Under Kentucky law, that's enough to arrest him for criminal trespass. So if we look at the facts shown, you know, we talk about the video a lot because the entire event is pretty well documented by that video, but if we look at the video, we see Mr. Blankenship walking up to the little gate into this fenced area past the no trespassing sign, and that's docket number 55-5 in this picture. There's a gate, there's a fenced area. He's just a few yards away inside that fenced area where he's preaching. When I say a few, I mean it may be 30, 40 yards inside that fenced area. All Mr. Blankenship had to do was stop at the entrance where he passed between those two no trespassing signs that he recorded on video. He could have stopped right there, preached to all of the same people walking down the same sidewalk in the same line, and he would have been allowed to go on preaching. But your opponent makes the argument that if Blankenship had a right to be in that area, he should have been able to be there, and that the fact that he could have been somewhere close by is not enough to prevent him from exercising his First Amendment rights. As far as we know, we would say it's undisputed that he did not have a right to be in that area. So under Kentucky law taken in order, the first time that he committed criminal trespass, it's all one act, but the first time he satisfied all of the elements for criminal trespass was when he walked between these two no trespassing signs into the fenced area. And our criminal trespass law says that the way that we show that a person doesn't have a right to be on the property is that the property is fenced, that it's posted no trespassing, or that they've been told to keep out or to leave by the property owner or representative of the property owner. So is your position then that Officer Young did not need himself to tell Blankenship to leave, that it was enough that the security guards had told Blankenship to leave? That is correct, Your Honor. That's what the statute says. So at the point when Mr. Blankenship walked between these signs into the fenced area without anybody speaking to him, he had committed criminal trespass. At the point when the Churchill Downs security told him to leave and he did not leave, and in fact from his comments that we quoted in our brief, he seemed to be aware that it was potentially a problem with the police. When he did not leave, he has yet again satisfied the elements of criminal trespass. Then when the state police came and Trooper Young told him to leave, what we see there is that there are five or six people in this group. They all turn and walk away except for Mr. Estefane, who's being placed under arrest, and Mr. Blankenship, who instead of walking away with the rest of his group, stands there and argues with the troopers. And Trooper Young says, hey, you're not leaving, therefore you're under arrest. And I see that my time is up, so I'll conclude by asking the court to affirm the judgment of the district court granting summary judgment to the defendants in this case. Thank you. I just wanted to reiterate. I'm not putting all my eggs in the content basket, as I argued, even if the restriction is content neutral. And I also want to make sure that I point out I'm not arguing that there's no such thing as an exclusive use permit that allows for ticketing to get onto public property. What I'm arguing is there is no exclusive use permit here, first of all. Second of all, to the extent that there was purportedly a ticket restriction, it wasn't enforced. So that doesn't serve any significant government interest. It's not narrowly tailored. It doesn't serve a significant government interest. If they were to say, well, road closures, we close roads. That protects that crowd control and public security. And I go to the event, and none of the roads are closed. The traffic's flowing freely, and I say the roads aren't closed. Well, yeah, they are. We put a sign, no vehicular traffic. It doesn't do any good if you're not enforcing it. There was a sign, but everybody was ignoring the sign and flowing through the area. I'm sorry. When you say there's no exclusive use permit here, is what you're saying— I just want to make sure I understand your argument. Is what you're saying, yes, I concede that this area where he was arrested is within the area that was granted an exclusive use permit, but although that sign was there, you could be in that area without a ticket, and that's all your client was doing. He was in an area where it was possible to be without a ticket. My argument is that it was a non-exclusive permit. If you look at the permit, it's only two pages, and this kind of dovetails with the void for vagueness. Close to half of the permit is just listing the street closures. It doesn't say anything about tickets. It says nothing about that. It's completely vague, and I would argue that in order to require tickets to access public property, that has to be in the permit. This court has acknowledged the distinction between exclusive use and non-exclusive use permits. In Parks v. Finan and McGlone v. Nashville, this court distinguished Cistrunk, which was the Bush-Quayle political rally case, by saying this is not a situation where you have an exclusive— they're granted a permit allowing them to exclude people who don't have tickets. That's not the case here. And secondarily, even if there is a ticketing requirement, it was not enforced. So it doesn't serve any purpose. It's not nearly tailored to serve any interest because they never enforced it. The public was flowing in freely, and they selected people after the fact to say, well, you can't be here. Teenage Mutant Ninja Turtles, the dancers apparently, you can't be here. Mr. Estefan on Friday, you're good. Mr. Blankenship, you can't be here. It was arbitrary and selective. You're making a lot of factual allegations and claims here. Does that mean your argument really is that the district judge did not do sufficient fact-finding before entering a summary judgment, that there are disputed material facts here? Is that what you're—in essence, is that what you're arguing? Well, I guess to the extent that there's a dispute as to whether you had to have a ticket to get in this area, I think that the statements after the fact in this litigation, you had to have a ticket to get in there. Well, I don't know if there's a dispute or not. I'm just trying to see if you're claiming that there's a dispute. I guess we need to look back at the district judge's decision to see what she says about the facts of the matter in conjunction with the entry of summary judgment. I'm trying, but I just want to know if you're saying that there was insufficient fact-finding here or that the facts are contrary to those found by the district judge. Is that what you're arguing? Well, I guess to the extent that I think it's clear from the record and from the video and from the testimony that no one was checking for tickets. You did not have to show a ticket to get into this area, which is different from reforming the record. Well, how do we know that? Was that a part of the fact-finding of the district court? Were there affidavits of testimony submitted to the district court on that point? I asked everyone that I deposed, did you ever see anyone checking for tickets? No. Again, if you look at the video and the photographs, there's the sign. There's nobody there. There's no table. There's nobody there checking for tickets. There are two points. One is it factually established that no one is checking for tickets, and is that your contention? Secondly, there's the issue of whether it makes any difference in the disposition of this case as to whether somebody was checking for tickets. So there are two aspects to your argument in that regard. You're saying that that's a critical or crucial issue as to whether someone was checking for tickets. I mean, judicially, I don't know if we've decided that yet one way or the other. Then you're saying that, as a matter of fact, there was nobody checking for tickets. So where in the record is it established that nobody was checking for tickets? Well, summary judgment was granted to the defendants. So there's certainly no evidence that you did have to have a ticket to get in this area. And Mr. Blankenship was removed, and he testified he was never asked to show a ticket. Your client's testimony, he may have a narrow aperture. I mean, his perception is not definitive for purposes of adjudicating his claims. I mean, your client is one witness. There may be other witnesses to this issue. Well, but he was also, now he's told he was removed because he didn't have a ticket. He was never, what if he did have a ticket? He was never asked to show a ticket. He wasn't removed. He wasn't told, you don't have a ticket, you can't be here. He was just said, you can't be here. They told you you can't be here. And Mr. Estefan, again, and he was arrested the same day. He was never asked. His declaration is in the record. He was never asked for a ticket, and yet they were removed purportedly for not having a ticket. And as far as whether that's important, I think it is because, again, this is public property. If you're requiring someone to show a ticket to access public property, that has to be. Yeah, but the use of the property at that day and time had been restricted by the municipal authority, and then we get into the issues, is that restriction reasonable and proper? So it's not an end of the inquiry to simply say that that's a matter of public property. But I think we have your argument in hand. I know your red light's been on. I'll defer to Judge Moyes. Yes, I thank you for your argument. Thank you all for the argument in this case, and it will be submitted.